# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BROOKHART, SALUSSOLIA, and SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**First Lieutenant HUNTER H. SATTERFIELD**
**United States Army, Appellant**

ARMY 20180125

Headquarters, 25th Infantry Division
Kenneth W. Shahan, Military Judge
Colonel Ian R. Iverson, Staff Judge Advocate

For Appellant: Colonel Elizabeth G. Marotta, JA; Major Julie L. Borchers, JA; Captain James J. Berreth, JA (on brief); Major Kyle C. Sprague, JA; Captain James J. Berreth, JA (on reply brief).

For Appellee: Colonel Steven P. Haight, JA; Lieutenant Colonel Wayne H. Williams, JA; Major Dustin B. Myrie, JA; Captain Lauryn D. Carr, JA (on brief).

30 October 2019

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

SCHASBERGER, Judge:

Lieutenant Hunter H. Satterfield appeals his convictions for assaulting his wife, asking us to set aside the findings of guilty. Appellant alleges that the military judge abused his discretion in precluding a defense expert witness from testifying about Borderline Personality Disorder (BPD). He argues that the military judge's ruling prevented him from explaining that his apologies to his wife were not because he had beaten her, but instead were appellant's attempt to respond to a person

suffering from a mental illness. We disagree that appellant was denied the ability to present his defense and find no abuse of discretion by the military judge.[1]

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of three specifications of assault consummated by a battery, in violation of Article 128, Uniform Code of Military Justice, 10 U.S.C. § 928 [UCMJ]. The military judge sentenced appellant to a dismissal and confinement for four months. The convening authority approved the adjudged sentence.[2]

## BACKGROUND

Appellant met SZ while she was an intern training dolphins in Hawaii. They began dating, and SZ stayed in Hawaii after the internship ended to continue the relationship. At first, SZ maintained her own apartment, but after a few months, she moved in with appellant.

A few months into the relationship, SZ and appellant got into an argument. The argument was loud and drew the attention of various neighbors who debated what to do. The argument ultimately turned physical. Appellant pushed SZ, causing SZ to fall and eventually hit her head on a nightstand. The neighbors heard the physical altercation, and one heard SZ say, "You promised you would never hit me." One of the neighbors then called the police. When the police arrived, SZ denied any assault.

Though this was not the only time appellant assaulted SZ, SZ agreed to marry appellant. They planned an elaborate and expensive wedding in Florida. Shortly before the wedding, appellant woke up with SZ's hair in his face. This angered appellant and he started punching SZ. After he went to work, SZ called her mother in Florida and told her about the assault. That day, SZ's mother sent SZ's cousin and step-father to Hawaii to bring SZ home to Florida.

---

[1] Appellant also asserts factual insufficiency for one of the specifications of assault consummated by a battery, and that he should receive meaningful relief for the dilatory post-trial processing of his case. We find no merit in either assertion. Regarding the post-trial delay, the government took 255 days to process the 859-page record of trial. We do not find a due process violation in, or determine appellant suffered prejudice as a result of, this delay.

[2] We have given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they are without merit.

When SZ's family members got to Hawaii, they took SZ to the hospital. The medical staff documented her injuries and bruises. While there, the police interviewed SZ and she made a statement regarding the assault. With her relatives' assistance, SZ left Hawaii and returned to Florida.

In response to SZ's departure, appellant sent a series of emails to SZ apologizing and stating that he loved her.[3] Appellant flew to Florida and contacted SZ. After a few days, he went to see SZ and spoke with her, her mother, and her step-father. While there, he apologized again and told them he was taking anger management classes. Appellant never mentioned anything about the possibility that SZ suffered from BPD. Appellant and SZ ultimately reconciled and got married on the beach in Florida.

After they married, SZ repeatedly recanted her previous claims of assault. She made a written recantation as part of an adverse administrative hearing, and also recanted when speaking with prosecutors from Hawaii. Approximately seven months after getting married, SZ and appellant separated. After they separated, SZ withdrew her recantations and again asserted that appellant assaulted her on various occasions.

At trial, appellant's defense strategy was to show that SZ was clumsy, bruised easily, and was not credible.[4] To put his various apologies into context, the defense argued that SZ suffered from BPD and that appellant believed the proper way to respond to a person with BPD was to apologize when accused of wrongdoing. In their opening statement, the defense counsel said they would put on evidence that SZ was impulsive, threw tantrums, had anger and violence issues, and had the ability to cut off close personal relationships. Defense counsel proffered that they would establish that appellant believed SZ had BPD, he researched BPD, and he sent the information about BPD to SZ. To support this theory, the defense wanted their expert consultant to testify as an expert witness. The government objected as to relevance, arguing that because SZ had never been diagnosed with this condition, an expert was not necessary.

---

[3] Appellant sent over a dozen emails professing his love and apologizing. For example, in response to SZ's email, "Marrying you won't change the fact that you beat me so bad I went to the [emergency room]," appellant responded, "All I can say is that I am very sorry and it will never happen again. . . ."

[4] The defense alleged several motives for SZ's "fabrications:" she was failing her classes and being a domestic violence victim got her an extension for classwork; she was embarrassed that she could not afford her wedding and needed an excuse to call it off; and that she suffered from BPD which caused her to lie.

The military judge ruled that based on the defense proffer he would allow the defense to discuss the theory in their opening statement. The military judge cautioned the defense that they would have to properly admit the evidence which they proffered to establish the relevance of the expert testimony and their theory. The defense was not able to meet this burden.

During the cross-examination of SZ, the defense attempted to lay the foundation that appellant believed SZ had BPD. However, the defense elicited no evidence of appellant's belief during the time frame of the charged assaults. The only evidence adduced was that months after the charged assaults, appellant sent SZ a link to an article about BPD.

During the defense case-in-chief, the defense called several witnesses to testify as to the behavior and character of SZ. The witnesses did not establish that SZ had any mental health conditions. The defense nonetheless renewed their request to call their expert witness. The government again objected on relevance grounds. After argument from both sides, the military judge ruled that given the state of the evidence, "I believe it is wholly irrelevant that an expert witness might believe that [SZ] exhibits symptoms of someone who might have [BPD]." The defense then asked to have the expert testify on the proper way to deal with a person with BPD. The military judge again determined, "it's not relevant, given the state of the evidence in the case right now."

The defense concluded their case with appellant testifying. Appellant denied ever assaulting SZ. His explanation for the photographs of SZ depicting a bruise on her leg was that she slipped and fell while hiking. He also remembered the hair incident very differently than SZ. He testified that he politely asked her to move her hair and when she declined, he rolled over and said he was going to work. SZ then became enraged and threw a violent temper tantrum, attacking him. As an explanation for the litany of emails apologizing to SZ, appellant explained the apologies referred to his calling her names rather than any physical assaults. He did not mention BPD at all in his testimony, instead stating, "I just found that if I was not confrontational to [SZ], it made things better."

## LAW AND DISCUSSION

We review a military judge's decision regarding the admissibility of expert testimony pursuant to Military Rule of Evidence [Mil. R. Evid.] 702 for an abuse of discretion. *United States v. Griffin*, 50 M.J. 278, 284 (C.A.A.F. 1999) (citation omitted). The abuse of discretion standard requires "more than a mere difference of opinion." *United States v. Eugene*, 78 M.J. 132, 134 (C.A.A.F. 2018). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Flesher*, 73 M.J.

4

303, 311 (C.A.A.F. 2014) (quoting *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008)). Additionally, "[a]n abuse of discretion exists where reasons or rulings of the military judge are clearly untenable and . . . deprive a party of a substantial right such as to amount to a denial of justice." *Id.* (internal quotation marks and citations omitted).

Military Rule of Evidence 702 provides that an expert witness may provide testimony if it "will assist the trier of fact to understand the evidence or determine a fact in issue." "A suggested 'test' for deciding 'when experts may be used' is 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject . . . .'" *Flesher*, 73 M.J. at 313 (quoting *United States v. Meeks*, 35 M.J. 64, 68 (C.M.A. 1992)).

Appellant argues that the military judge failed to conduct a proper analysis, i.e., that he did not analyze the *Houser*[5] factors and did not justify his conclusions. While we agree with appellant that the military judge should have made detailed findings of fact and conclusions of law,[6] we do not find that the military judge's conclusion that the expert's testimony was irrelevant, in light of the evidence before him, to be clearly erroneous.

We concur with the military judge that the defense expert's testimony, as proffered by defense counsel, was neither relevant nor necessary. The defense argument was that appellant believed SZ suffered from BPD, appellant interacted with SZ as if she had BPD, and the expert was necessary to show that appellant was reasonable in his beliefs and actions. This argument fails because the defense never adduced evidence that at the relevant time (at the time of the charged offenses) appellant believed SZ had BPD. There is also no evidence that appellant believed that the appropriate way to deal with a person with BPD was to apologize. Without that predicate evidence, the testimony of the expert never became relevant.

---

[5] In *United States v. Houser*, our superior court articulated six factors for a military judge to consider when determining if an expert may testify: (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony is not substantially outweighed by the other considerations outlined in Mil. R. Evid. 403. 36 M.J. 392, 397 (C.M.A. 1993).

[6] As the military judge failed to put a detailed analysis on the record, we grant his conclusions less deference. *See United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002).

Contrary to appellant's assertion that he was denied the "foundation of his defense," appellant was not prevented from presenting a defense guaranteed by the Fifth and Sixth Amendments. *See United States v. Ndanyi*, 45 M.J. 315, 321 (C.A.A.F. 1996). Even without an expert, the defense was able to present and argue at trial that appellant's apologies were based on his belief in SZ's BPD. To that end, appellant expressly testified, "I just found that if I was not confrontational to [SZ], it made things better." Further, the defense introduced evidence that SZ was impulsive, spoiled, and a liar. The defense also introduced several of SZ's prior inconsistent statements and cross-examined her on them.

Even assuming the defense expert's testimony was relevant and more probative than prejudicial,[7] we must still test for prejudice. "We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999) (citation omitted).

The government's case was strong. In addition to the victim's testimony, the government introduced the testimony of the neighbor who overheard one of the assaults, the testimony of the medical staff who treated SZ after another assault, the photographs of injuries from two separate assaults, the testimony of SZ's family, and the numerous apologies from appellant. The defense case was not as strong. It was based almost exclusively on attacking the credibility of SZ. The defense introduced evidence of SZ recanting various allegations of assault; however, all the recantations were in the context of either saving her relationship with appellant or saving appellant's career. Defense's recantation argument was also severely undercut by the evidence corroborating SZ's allegations. Though, appellant testified in his defense, his explanations of the apologies rang hollow; he did not mention BPD as a reason for apologizing, instead stating that the apologies were for calling her a "cunt" and a "bitch." The last two prongs of our prejudice analysis also don't support a conclusion that appellant was prejudiced: the evidence was not material and would have been speculative at best.

Accordingly, we find the military judge did not abuse his discretion in denying the defense request for expert testimony, and even if the military judge clearly erred, appellant was not prejudiced.

---

[7] As the military judge did not discuss an analysis under Mil. R. Evid. 403, we will assume if it was relevant then it should have been allowed.

## CONCLUSION

Upon consideration of the entire record, the findings of guilty and the sentence are AFFIRMED.

Senior Judge BROOKHART and Judge SALUSSOLIA concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
BROOKHART, SALUSSOLIA, and SCHASBERGER
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**First Lieutenant HUNTER H. SATTERFIELD**
**United States Army, Appellant**

ARMY 20180125

---
NOTICE OF COURT-MARTIAL ORDER CORRECTION
---

IT IS ORDERED THAT, to reflect the true proceedings at the trial of the above-captioned case,

GENERAL COURT-MARTIAL ORDER NUMBER 9, HEADQUARTERS, 25TH INFANTRY DIVISION, SCHOFIELD BARRACKS, HAWAII 96857, dated 26 November 2018,

IS FURTHER CORRECTED AS FOLLOWS:

BY deleting at the top of page one "Firearms Prohibitions Apply- Felony Conviction. 18 U.S.C. 922(g)(1)."

BY adding at the top of page one "Misdemeanor Crime of Domestic Violence. 18 U.S.C. 922(g)(9)."

DATE: 30 October 2019

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court